#26521-a-LSW

**2013 S.D. 70**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

BOBBIE M. SEVERSON, f/k/a
BOBBIE M. HUTCHINSON,                    Plaintiff and Appellant,

    v.

KENNETH N. HUTCHINSON,                   Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
STANLEY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOHN L. BROWN
Judge

* * * *

ROSE ANN WENDELL
Pierre, South Dakota                     Attorney for plaintiff
                                         and appellant.


DAVID W. SIEBRASSE
Pierre, South Dakota                     Attorney for defendant
                                         and appellee.


* * * *

CONSIDERED ON BRIEFS
ON AUGUST 27, 2013

OPINION FILED **09/25/13**

#26521

WILBUR, Justice

[¶1.]     Kenneth Hutchinson (Father) and Bobbie Severson (Mother) are the

parents of five children.  The trial court awarded primary physical custody of the

children to Father.  Mother appeals.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

[¶2.]     Mother and Father were married in 1997.  Five children were born to

the marriage: two daughters, M.L.H. and A.M.H.; and three sons, J.R.H., Z.C.B.H.,

and M.J.H.

[¶3.]     In March 2009, Father was removed from the marital home as a result

of an investigation by the Department of Social Services.  The investigation

commenced because of Father's alleged abuse of one of the children.  Father

successfully completed the requirements of parenting classes and the allegations of

abuse were eventually found to be "unsubstantiated with concern."*  Also during

---

*     At the permanent custody hearing on August 16, 2012, Father testified on
      cross-examination as to his understanding of what "unsubstantiated with
      concern" meant:

      **A.** The concerns were not listed.  That was the bottom
      statement from the DSS report[—]unsubstantiated with
      concern.

      **Q.** ([Mother's counsel]) Well, you met with them, didn't you, had
      meetings with them during that time, during that 18-month
      investigation?

      **A.** That's correct.

      **Q.** And what's your understanding of what their concerns were?
      . . . .

      **A.** The concerns they had were my raising my voice to the
      children and use of spanking.

-1-

this time, Mother obtained a temporary protection order against Father, but that order was eventually modified to a civil restraining order.

[¶4.] In an effort to salvage their marriage following the Department of Social Services' investigation, the couple and the children began to reside together on the weekends. When efforts to save the marriage failed, Mother filed for divorce in March 2010.

[¶5.] In September 2010, however, the couple again reconciled and resided together with their children. This reconciliation period did not last long. The couple eventually divorced by stipulation and the judgment and decree of divorce was filed on December 9, 2010. The parties stipulated to joint legal custody with Mother having primary physical custody of the five children.

[¶6.] Also during that time, Mother was having a relationship with another man (new husband), whom she eventually married in 2011. Mother's relationship with her new husband was often violent. At one point during Mother's marriage to her new husband, Mother requested a domestic violence protection order against her new husband and a temporary protection order was granted. After Mother filed a motion to dismiss the protection order, the protection order was dismissed.

[¶7.] Several of the children have mental and emotional issues. M.L.H., the eldest daughter and child, and J.R.H., the eldest son, would often get into verbal and physical arguments with one another.

[¶8.] Following the domestic violence incident between Mother and Mother's new husband, Father sought both emergency and permanent change of custody for the five children on June 2, 2011. In support of these motions, Father contended

that Mother was not parenting the children and not protecting them from Mother's new husband's violent behavior.

[¶9.]     At the emergency custody hearing on June 15, 2011, the trial court heard testimony from Mother and Father and Mother's friend, Mae Davis. Davis testified that she had concerns about Mother leaving the children alone during the day for several hours at a time and overnight so that Mother could travel out of town to see Mother's new husband. Davis also stated that Mother would speak negatively about Father in front of the children. Davis further testified that Mother knew that her new husband had a criminal record of domestic abuse and terroristic threats. Davis described the lack of stability and unkempt condition of Mother's home. By contrast, Davis testified that Father had a stable, structured, and clean home environment for the children. Additionally, Davis told the trial court that Father did not speak negatively about Mother to the children.

[¶10.]     At the conclusion of the emergency custody hearing, the trial court granted temporary custody of the five children to Father. In doing so, the trial court noted its concerns about Mother's ability to protect the children from her new husband and Mother's choice to leave the minor children alone for several hours at a time and overnight so that Mother could visit her new husband. The trial court ordered that Mother have visitation with the children and that a home study be conducted.

[¶11.]     During the time period between the temporary custody trial and the permanent custody trial, Mother divorced her new husband. Additionally, a few

months after Father was awarded temporary custody of the five children, M.L.H. returned to Mother's home to reside.

[¶12.] A three-day custody trial was held in August 2012. The parties, several lay witnesses, a home study evaluator, a psychologist, and a nurse practitioner testified. The trial court concluded that the testimony of Dr. Andre Clayborne, the home study evaluator; Dr. Stephan Langenfeld, the psychologist who conducted psychological evaluations on Mother and Father; and John Erpenbach, the nurse practitioner who performed a psychological evaluation on Mother, was "consistent in what they observed and what they recommended." Dr. Clayborne conducted a home study evaluation, which thoroughly analyzed the applicable *Fuerstenberg* factors, and recommended that Father retain primary physical care of the five children with Mother having visitation. Dr. Langenfeld testified that Mother has "generalized anxiety disorder" with "avoidant, dependent and self-defeating personality characteristics." He further stated that his "general impression is . . . she's got some stuff that's going to make it more difficult for her to effectively parent." Dr. Langenfeld further testified that Father has "obsessive-compulsive and dependent personality characteristics[,]" but "that [Father] does not appear to be presenting significant emotional or psychological issues that would prevent [Father] from parenting." He also told the trial court that Father presented an overly positive picture of Father's current situation, but Father's response did not invalidate the test. Finally, Erpenbach testified that Mother's symptoms were consistent with a generalized anxiety disorder. Mother had been prescribed medication for her medical symptoms.

[¶13.] Additionally, Carrie Frahm, a friend of the couple, testified that Father "has some of the most exceptional parenting skills that [she had] ever witnessed" and that Father was even-tempered and that Father was able to successfully parent five children by himself. She also testified that she helped clean Mother's house and that she and Mother were no longer friends because of Mother's dishonesty as it relates to Father and the children. The trial court found Frahm's testimony to be the most credible and "her testimony indicate[d] [Father] [was] the more stable and consistent parent." And during the custody hearing, the trial court remarked that Frahm's testimony was the most credible because "she had the best opportunity to observe the parties and their interactions with the children[.]"

[¶14.] The trial court ultimately awarded joint legal custody and primary physical custody to Father. In doing so, the trial court noted that both parents are fit parents, though neither parent is perfect. The trial court found that while Father "present[ed] a more calm, stable and consistent demeanor, at least as . . . to the . . . [c]hildren[,]" "[Father] need[ed] to work on his communication skills[.]" In discussing Mother's demeanor, the trial court noted that Mother was "volatile and emotional in her dealing with issues and that contribute[d] to conflict." The trial court also acknowledged its concerns regarding Mother's prescribed medication and her consistency in taking her prescribed medication and in attending counseling. Additionally, the trial court determined that there were no compelling reasons to separate the siblings.

[¶15.] Mother appeals from the trial court's order granting primary physical custody of the five children to Father. Mother and Father filed motions with this Court each requesting appellate attorney fees pursuant to SDCL 15-26A-87.3.

## STANDARD OF REVIEW

[¶16.] "We review 'child custody decisions under the abuse of discretion standard of review.'" *Roth v. Haag*, 2013 S.D. 48, ¶ 11, 834 N.W.2d 337, 339-40 (quoting *Schieffer v. Schieffer*, 2013 S.D. 11, ¶ 13, 826 N.W.2d 627, 633). "An abuse of discretion is a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Id.* (quoting *Schieffer*, 2013 S.D. 11, ¶ 14, 826 N.W.2d at 633). "In the context of reviewing custody decisions, an abuse of discretion occurs . . . when the trial court's review of the traditional factors bearing on the best interests of the child is scant or incomplete." *Id.*

[¶17.] Additionally, findings of fact are reviewed for clear error. *Schieffer*, 2013 S.D. 11, ¶ 15, 826 N.W.2d at 633. We "will overturn the trial court's findings of fact on appeal only when a complete review of the evidence leaves this Court with a definite and firm conviction that a mistake has been made." *Id.* (quoting *Kreps v. Kreps*, 2010 S.D. 12, ¶ 25, 778 N.W.2d 835, 843). We "give[ ] due regard to the trial court's opportunity 'to judge the credibility of witnesses and to weigh their testimony.'" *Id.* (quoting *Walker v. Walker*, 2006 S.D. 68, ¶ 11, 720 N.W.2d 67, 70-71).

## DECISION

[¶18.] Mother argues that based on the *Fuerstenberg* factors, the trial court erred in determining that it was in the best interests of the children that Father be

awarded primary physical custody. *See generally Fuerstenberg v. Fuerstenberg*, 1999 S.D. 35, 591 N.W.2d 798. Specifically, she asserts that until the trial court awarded Father temporary custody in 2011, the children had always been in Mother's primary care and that she had provided for the children's emotional issues. She contends that while in Father's care, the children's aggression towards each other had increased and that Father refused to acknowledge that this aggression was occurring. Mother further argues that Father did not acknowledge his own violent past; lacked insight into his own personal issues; had not sought counseling to address his own personal issues; and lacked insight into the children's behaviors and needs. Mother asserts that the couple divorced because of the domestic violence that had occurred in the marital home. Lastly, Mother contends that "due to the considerable amount of individual issues many of the children [were] experiencing, especially the ongoing violence between J.R.H. and M.L.H., the children need to be separated."

[¶19.]     "When determining custody, the court shall be guided by consideration of what appears to be for the best interests of the child in respect to the child's temporal and mental and moral welfare." *Roth*, 2013 S.D. 48, ¶ 13, 834 N.W.2d at 340 (quoting *Schieffer*, 2013 S.D. 11, ¶ 17, 826 N.W.2d at 634). "The trial court may, but is not required to, consider the following *Fuerstenberg* factors in determining the best interests and welfare of the child: parental fitness, stability, primary caretaker, child's preference, harmful parental misconduct, separating siblings, and substantial change of circumstances." *Id.* "We encourage trial courts to take a balanced and systematic approach when applying the factors relevant to a

child custody proceeding." *Id.* (quoting *Schieffer*, 2013 S.D. 11, ¶ 18, 826 N.W.2d at 634). "However, 'a court is not bound to make a specific finding in each category; indeed, certain elements may have no application in some cases, and for other cases there may be additional relevant considerations. In the end, our brightest beacon remains the best interests of the child.'" *Id.* (quoting *Beaulieu v. Birdsbill*, 2012 S.D. 45, ¶ 10, 815 N.W.2d 569, 572).

[¶20.] "[S]iblings and half-siblings should not be separated absent compelling circumstances." *Id.* ¶ 15, 834 N.W.2d at 341 (quoting *Simunek v. Auwerter*, 2011 S.D. 56, ¶ 10, 803 N.W.2d 835, 837). "However, this is not an absolute rule, and maintaining children in the same household should never override what is in the best interests of a child." *Id.*

[¶21.] Here, the trial court determined both parents to be fit parents, but noted that neither is a perfect parent. The trial court also found that until the trial court awarded Father temporary custody in 2011, Mother had been the primary caretaker of the children and then Father "step[ped] up to the plate" and "demonstrated his concern and care for the . . . [c]hildren." These findings were supported by the testimony of multiple witnesses at the permanent custody hearing. Frahm, who the trial court found to be the most credible, described Father's "exceptional parenting skills" and his even temperament with the children. She testified that she "admired [Father's] ability to stay calm and manage that number of kids[.]" We defer to the trial court's opportunity to judge Frahm's credibility and the weight the trial court afforded to her testimony.

[¶22.] Additionally, the trial court found the testimony of the experts to be "consistent in what they observed and what they recommended." Indeed, Dr. Clayborne recommended that Father be granted primary physical care of the five children. In so concluding, Dr. Clayborne's home study report analyzed the applicable *Fuerstenberg* factors and noted that "the parent who [was] currently equipped to provide the children with the necessary structure [was Father]." Dr. Langenfeld also supported this conclusion in stating that his "general impression [of Mother] is . . . she's got some stuff that's going to make it more difficult for her to effectively parent." The trial court also acknowledged each party's faults and discussed ways to address these faults with each party.

[¶23.] Further, the trial court found no compelling circumstances that would justify the separation of the siblings. The witnesses' testimony and exhibits support this finding. Dr. Clayborne testified that he observed a bond between the siblings and that he did not recommend the separation of siblings. Additionally, Frahm testified that upon J.R.H.'s return home from in-patient therapy, J.R.H. was "[c]ompletely different" and he "was just happy" and "looked fantastic." Because she requested the separation of the children, it was Mother's burden to show compelling circumstances. Mother has not met her burden. Here, the record does not support the separation of siblings and, again, we give due regard to the trial court's opportunity to judge credibility of the witnesses and the weight afforded to their testimony.

[¶24.] As noted above, "[w]e encourage trial courts to take a balanced and systematic approach when applying the factors relevant to a child custody

proceeding." *Id.* ¶ 13, 834 N.W.2d at 340 (quoting *Schieffer*, 2013 S.D. 11, ¶ 18, 826 N.W.2d at 634). And, while we do not require that there be a specific finding in every category, because, "indeed, certain elements may have no application in some cases, and for other cases there may be additional relevant considerations[,]" we do remind trial courts of their duty to thoroughly examine the applicable *Fuerstenberg* factors. *See id.* (quoting *Beaulieu*, 2012 S.D. 45, ¶ 10, 815 N.W.2d at 572). Here, the extent of the findings from the trial court concerning the applicable factors was fairly meager. However, the trial court relied upon Dr. Clayborne's recommendation and home study report, which did thoroughly examine the applicable *Fuerstenberg* factors. Accordingly, the trial court did not abuse its discretion in determining that it was in the best interests of the children that Father be awarded primary physical custody.

[¶25.]     We deny both parties' requests for appellate attorney fees.

## CONCLUSION

[¶26.]     The trial court did not abuse its discretion in determining that it was in the best interests of the children that Father be awarded primary physical custody. We affirm.

[¶27.]     GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and SEVERSON, Justices, concur.